# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 15, 2018   Decided June 18, 2019

No. 18-1111

NEW YORK REPUBLICAN STATE COMMITTEE AND TENNESSEE
REPUBLICAN PARTY,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of a Final Order
of the Securities & Exchange Commission

———

*Edmund G. LaCour Jr.*  argued the cause for petitioners. With him on the briefs were *H. Christopher Bartolomucci* and *Jason B. Torchinsky*.

*Jeffrey A. Berger*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief was *Michael A. Conley*, Solicitor.

*Carter G. Phillips*, *Joseph Guerra*, *Tobias S. Loss-Eaton*, and *Michael L. Post* were on the brief for *amicus curiae* Municipal Securities Rulemaking Board in support of respondent.

Before: PILLARD, *Circuit Judge*, and GINSBURG and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

GINSBURG, *Senior Circuit Judge:* In 2016 the Securities and Exchange Commission adopted Rule 2030, which regulates the political contributions of those members of the Financial Industry Regulatory Authority (FINRA), a self-regulatory association of broker-dealers, who act as "placement agents" – *i.e.*, individuals and firms that investment advisers hire to help them secure contracts advising a government entity. The Rule prohibits a placement agent from accepting compensation for soliciting government business from certain candidates and elected officials within two years of having contributed to such an official's electoral campaign or to the transition or inaugural expenses of a successful candidate. The New York Republican State Committee (NYGOP) and the Tennessee Republican Party petition for review of the SEC's order approving Rule 2030, on the grounds that: (1) the SEC did not have authority to enact the Rule; (2) the order adopting the Rule is arbitrary and capricious because there was insufficient evidence it was needed; and (3) the Rule violates the First Amendment to the Constitution of the United States. The SEC challenges the petitioners' standing to bring the case and defends the Rule against these arguments.

We hold the NYGOP has standing and deny its petition on the merits. The SEC acted within its authority in adopting

Rule 2030; doing so was not arbitrary and capricious because the SEC had sufficient evidence it was needed; and the Rule does not violate the First Amendment in view of our holding in *Blount v. SEC*, 61 F.3d 938 (1995), in which we upheld a functionally identical rule against the same challenge.

## I. Background

The SEC adopted the challenged rule in response to longstanding concerns about so-called "pay-to-play" activity in the public pension market. We therefore begin by laying out what prompted the SEC's decision to regulate the contributions of placement agents to candidates and incumbents for elected office.

### A. Pay-to-Play and Public Funds

In many instances, local and state government officials responsible for holding and managing public funds, such as pension funds and tuition plans, are also responsible for choosing investment advisers to manage plan assets. Political Contributions by Certain Investment Advisers, Investment Advisers Act Release No. IA–3043, 75 Fed. Reg. 41018, 41019/1 (July 14, 2010).[1] By 2010 an increasing number of enforcement actions had revealed that some of these elected officials chose investment advisers based upon whether the would-be adviser had given them money or donated to their campaign. 75 Fed. Reg. at 41019/3-20/3; *id.* at 41039 n.290. For example, the SEC brought cases against the former Treasurer of the State of Connecticut and other defendants,

---

[1] Henceforth, for the sake of simplicity, we follow the lead of the SEC in using the term "public pension plan" to refer to any investment program "sponsored or established" by a government entity, "regardless of whether they are retirement funds." 75 Fed. Reg. 41018 n.3.

alleging the Treasurer had allocated pension fund investments to fund managers in exchange for political contributions and other payments made through the Treasurer's "friends and political associates." *Id.* at 41020/1.

Concerned that these practices distort the market for investment advisory services, the SEC adopted a rule in 2010 regulating the political contributions of firms and individuals registered under the Investment Advisers Act of 1940, which prohibits any adviser from engaging "in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4); *see* 17 C.F.R. § 275.206(4)-5. This "Advisers Act rule" makes it unlawful for an investment adviser to provide services "for compensation to a government entity within two years after a contribution to an official of the government entity is made by the investment adviser or any covered associate of the investment adviser." 17 C.F.R. § 275.206(4)-5(a)(1). The rule was "modeled on" Rule G-37 of the Municipal Securities Rulemaking Board (MSRB), 75 Fed. Reg. at 41020/3, which the SEC had approved in 1994 and which imposes a similar two-year "time-out" upon a dealer in the municipal securities market who has donated to a covered official. Self-Regulatory Organization - Municipal Securities Rulemaking Board, Exchange Act Release No. 34-33868, 59 Fed. Reg. 17621, 17622/3-25/3 (Apr. 13, 1994). The SEC modeled its rule upon MSRB Rule G-37 in part because we had upheld that rule against a first amendment challenge in *Blount*, and in part because the SEC believes G-37 was successful in "significantly curb[ing] pay to play practices in the municipal securities market." 75 Fed. Reg. at 41020/3, 41023/3; *see also* Order Approving a Proposed Rule Change To Adopt FINRA Rule 2030 and FINRA Rule 4580 To Establish "Pay-To-Play" and Related Rules, Exchange Act Release No. 34-78683, 81 Fed. Reg. 60051, 60065/1 (Aug. 31, 2016).

The SEC understood the Advisers Act rule would not address all instances of pay-to-play corruption. In particular, it was aware of several cases in which an investment adviser did not contribute directly to a candidate or incumbent but instead acted through a placement agent. *See* 75 Fed. Reg. at 41037/3-38/1; Notice of Filing of a Proposed Rule Change To Adopt FINRA Rule 2030 and FINRA Rule 4580 To Establish "Pay-to-Play" and Related Rules, Exchange Act Release No. 34-76767, 80 Fed. Reg. 81650, 81651/1 (Dec. 30, 2015). For example, a placement agent who funneled contributions to the New York State Comptroller secured contracts for its client to advise $250 million worth of pension fund investments. 81 Fed. Reg. at 60065/3; 75 Fed. Reg. at 41019/3-20/3. The SEC was therefore "concerned that a rule that failed to address the use of [placement agents] would be ineffective were advisers simply to begin using ... placement agents" to get government clients. 75 Fed. Reg. at 41037/3.

Instead of barring investment advisers from hiring placement agents, however, the SEC allowed an adviser to retain a placement agent who is a member of the FINRA, 17 C.F.R. § 275.206(4)-5(a)(2)(i)(A); 15 U.S.C. § 78c(a)(26), if the FINRA would impose restrictions upon its members that were "substantially equivalent [to] or more stringent" than the SEC's parallel rule for investment advisers. 17 C.F.R. § 275.206(4)-5(f)(9)(ii); *see Ga. Republican Party v. SEC*, 888 F.3d 1198, 1200 (11th Cir. 2018); 81 Fed. Reg. at 60063/3 (noting the FINRA had agreed to "prepare rules for [the SEC's] consideration that would prohibit its [placement agent] members" from engaging in pay-to-play activity).

## B. FINRA Rule 2030

In 2015 the FINRA proposed Rule 2030, which is modeled after the Advisers Act rule and MSRB Rule G-37. 81 Fed. Reg. at 60053/1, 60057/2. Rule 2030(a), subject to some exceptions, prohibits a FINRA member from

> Engag[ing] in distribution or solicitation activities for compensation with a government entity on behalf of an investment adviser that provides or is seeking to provide investment advisory services to such government entity within two years after a contribution to an official of the government entity is made by the covered member or a covered associate.

In other words, if a placement agent makes a contribution to a government official who can influence a government entity's choice of an investment adviser, *see* Rule 2030(g)(8) (defining "official"), then the placement agent must wait two years before he or his firm can accept payment for soliciting that government entity on behalf of a client. The "two-year time-out" is intended to serve as a "cooling-off period during which the effects of a political contribution on the selection process can be expected to dissipate." 81 Fed. Reg. at 60053/1.

Rule 2030(b) prevents circumvention of this primary prohibition by forbidding a covered member or a "covered associate" of a member from "solicit[ing] or coordinat[ing] any person or political action committee" to make any contributions to a covered official. *See also* Rule 2030(g)(2) (defining "covered associate"). The covered member or associate is also forbidden from "soliciting or coordinating any person or political action committee to make any payment to a political party of a state or locality of a government entity

with which the covered member is engaging in, or seeking to engage in, distribution or solicitation activities on behalf of an investment adviser." Rule 2030(b)(2) (cleaned up). Put another way, a placement agent may not solicit contributions for a political party and later be paid to serve as a placement agent for the state or locality of that party.

Rule 2030(c)(1) sets forth an exception to the Rule for de minimis contributions, allowing an associate of a FINRA member firm to contribute up to $350 to a candidate or incumbent if he or she is eligible to vote for that person; otherwise the limit is $150.

When the SEC approved FINRA Rule 2030 in 2016, the NYGOP, along with the Tennessee and Georgia Republican Parties, filed a joint petition in the Eleventh Circuit for review of the SEC order. 81 Fed. Reg. at 60051; *Ga. Republican Party*, 888 F.3d at 1201. The Eleventh Circuit held the Georgia party did not have standing to challenge the order and transferred the case to this court based upon the applicable venue statute. *Id.* at 1205 (citing 15 U.S.C. § 78y(a)(1)).

## II. Analysis

### A. Standing

In order to bring their challenge, the petitioners must establish they have satisfied the "constitutional minimum" for standing to sue, which requires that (1) they have suffered an injury-in-fact, (2) caused by the challenged conduct; and (3) a favorable decision is likely to redress that injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). If any one of the petitioners has standing to raise a claim, then this court has jurisdiction over that claim without regard to whether any

other petitioner also has standing. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017).

Although we are typically skeptical about a petitioner's standing where, as here, neither petitioner is regulated by the challenged rule, *Lujan*, 504 U.S. at 561-62, we hold the NYGOP has met its burden by advancing "specific facts" to support its claim to have suffered an injury-in-fact. *Id.* at 561; *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). The NYGOP has submitted the affidavit of Francis Calcagno, a placement agent covered by Rule 2030, stating that "if Rule 2030 were no longer in effect," then he "would solicit contributions for the NYGOP from [his] friends, family, and other contacts." Add. to Pet'rs' Br. 18-19.

An organization is obviously "harmed if its contributors cease giving it money." *Taxation with Representation of Wash. v. Regan*, 676 F.2d 715, 723 (D.C. Cir. 1982) (holding a nonprofit has standing to bring a first amendment challenge against restrictions denying tax deductions to its contributors), *rev'd on other grounds*, 461 U.S. 540 (1983). Hence, we hold the NYGOP's reduced ability to raise funds due to Rule 2030 constitutes a concrete and particularized injury for purposes of Article III standing.

The SEC claims *Taxation* is inapplicable because the tax statute challenged in that case affected the entire donor base of a nonprofit organization, whereas the NYGOP has not shown placement agents affected by Rule 2030 constitute more than a minority of its potential contributors. As the petitioners point out, however, this argument addresses only the degree of their injury. As we have long held, even a slight injury is sufficient to confer standing; the size of the harm therefore poses no jurisdictional barrier to the NYGOP's

claim. *See Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 138 (D.C. Cir. 1977).

The SEC next invokes *Clapper v. Amnesty International USA,* 568 U.S. 398 (2013), to argue the petitioners' risk of harm is too speculative because it relies upon the decisions of third parties not before us. In *Clapper*, the Supreme Court held that certain attorneys and organizations did not have standing to challenge a provision of the Foreign Intelligence Surveillance Act of 1978 because they failed to show their claimed injury – namely, that their communications with overseas clients and contacts would be intercepted by the Government – was "certainly impending." *Id.* at 410-14. As the Supreme Court later clarified, however, a plaintiff is not limited to establishing injury-in-fact by showing that a harm is "certainly impending"; it may instead show a "substantial risk" that the anticipated harm will occur. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). We have, therefore, determined that "the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm ... as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017).

We have already determined that the NYGOP's reduced ability to raise funds is a concrete and particularized harm to the organization. The question now is whether the NYGOP has shown it faces a "substantial risk" of this harm materializing.

We hold the NYGOP has met its burden. To be sure, Calcagno has not shown with literal certainty that his contacts would have donated to the NYGOP upon his request. But

*Clapper* does not require certainty; instead, it understandably holds a plaintiff's risk of harm cannot be based upon a "highly attenuated chain of possibilities." 568 U.S. at 410. Unlike in *Clapper*, where the chain comprised several links, "requir[ing] the assumption that independent decisionmakers" – the Attorney General, the Director of National Intelligence, and judges of the Foreign Intelligence Surveillance Court – "would exercise their discretion in a specific way," *Attias*, 865 F.3d at 626, here the plaintiff's standing requires only the single inference that at least one of Calcagno's family, friends, or contacts would have donated a few dollars to the NYGOP had Calcagno asked him or her to do so. In our view, that inference is eminently reasonable – indeed, irresistible; the increased risk of at least some harm as a result of the SEC's decision to adopt Rule 2030 is therefore substantial and not speculative. *Cf. id.* at 628-29 (contrasting the substantial risk of identity theft posed by a data hack with the "long sequence of uncertain contingencies" in *Clapper*). We do not believe that a practical application of Article III requires more than the affidavit before us.

In short, we hold the NYGOP has Article III standing to pursue this case. The NYGOP's reduced ability to raise funds due to Rule 2030 constitutes a non-speculative injury-in-fact, which would be redressed were we to grant its petition.

## B. Authority of the SEC

We turn now to the petitioners' challenge to Rule 2030 as an ultra vires regulation of campaign finance. Pursuant to Section 15A of the Securities Exchange Act of 1934, the SEC "shall approve" a rule proposed by the FINRA – the only registered national securities association, *see Self-Regulatory Organization Rulemaking*, SEC. EXCH. COMM'N (Mar. 5, 2019), https://www.sec.gov/rules/sro.shtml – if it is

"consistent with the requirements of [the Act]." 15 U.S.C. § 78s(b)(2)(C)(i). Section 15A also authorizes the FINRA to make rules to "prevent fraudulent and manipulative" practices, "to promote just and equitable principles of trade," and to "remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6); *see also* 81 Fed. Reg. at 60062/3-63/1.

The SEC says Rule 2030 comes within this authority because pay-to-play transforms the process by which government officials select investment advisers into one in which political contributions, rather than the competence and cost of investment advisers, drive the award of contracts. *See* 81 Fed. Reg. at 60063/1-65/3. As a result, public pension funds are more likely to be managed by less qualified investment advisers and to pay higher fees, to the detriment both of the funds' beneficiaries and of taxpayers. *Id*. at 60065/2; 75 Fed. Reg. at 41022/2-3. Indeed, pay-to-play presents a familiar agency problem in which the agent, who selects advisers for the fund, has an interest that diverges from that of his principals – the beneficiaries. This is not a self-correcting problem: Investment advisers and placement agents who decline to pay are put at a competitive disadvantage. *See Blount*, 61 F.3d at 945-46.

We agree with the SEC's view of its authority. As we said in *Blount*, 61 F.3d at 945, regulating pay-to-play practices in the municipal bond market is within the authority of the SEC to reduce distortion in financial markets:

> "Pay to play" practices raise artificial barriers to competition for those firms that either cannot afford or decide not to make political contributions. Moreover, if "pay to play" is the

determining factor in the selection of an underwriting syndicate, an official may not necessarily hire the most qualified underwriter for the issue.... "Pay to play" practices undermine [just and equitable] principles [of trade] since underwriters working on a particular issuance may be assigned similar roles, and take on equivalent risks, but be given different allocations of bonds to sell – resulting in differing profits – based on their political contributions or contacts.

*Id*. This reasoning, of course, is not limited to the market for municipal securities at issue in *Blount*; it applies with equal force to the pension funds at risk of corruption in this case. *See* 81 Fed. Reg. at 60063/2-3 ("[P]ublic pension plans are particularly vulnerable to pay-to-play practices").

The petitioners first complain this view of the SEC's authority is too expansive. In support, they cite *California Independent System Operator Corp. v. FERC*, 372 F.3d 395 (2004) (*CAISO*), in which we held the Federal Energy Regulatory Commission (FERC) exceeded its statutory authority when it ordered a state-created utility corporation to adopt a method for selecting members of its board, in derogation of the method prescribed by a state statute. The FERC claimed it was acting pursuant to its authority to regulate a "practice" affecting a rate collected by a public utility, *id.* at 399, but after analyzing the meaning of that word in the Federal Power Act, *id*. at 398-401, we concluded the "breathtaking scope" of the FERC's interpretation was unreasonable. *Id*. at 401.

The petitioners here do not explain how *CAISO* bears upon the present case. To be sure, both cases involve a

federal agency accused of acting outside the bounds of its authority, but there the similarity ends. The reasoning in *CAISO* is addressed to the specific provisions of the Federal Power Act, and the petitioners do not explain how it might in any meaningful way affect our analysis of the Exchange Act. Nor do the petitioners marshal any evidence to draw into question our observation in *Blount* that there is a "self-evident" connection "between eliminating pay-to-play practices and the Commission's [twin] goals of 'perfecting the mechanism of a free and open market' and promoting 'just and equitable principles of trade.'" 61 F.3d at 945.

The petitioners argue in the alternative that the Congress surely "could not have intended to delegate a decision of such ... significance to an agency." Pet'rs' Reply Br. 14 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Rather, the argument goes, the Congress has reserved to itself the authority to determine when a political contribution poses a risk of corruption, because it has chosen to set limits directly through the Federal Election Campaign Act of 1971 (FECA). As evidence that the Congress intends to dictate when limits may be adjusted or imposed, the petitioners cite a provision of the FECA that specifies contribution limits shall increase based upon changes in the price index, 52 U.S.C. § 30116(c), as well as FECA provisions that bar contributions from certain groups, such as national banks and foreign nationals, §§ 30118, 30121, but not from placement agents.

Because none of these provisions bears upon the SEC's authority to uproot pay-to-play corruption in financial markets, we take the petitioners' argument to be that provisions of the later-enacted FECA work an implied repeal – a term the petitioners understandably reject – of the SEC's

14

pre-existing authority to regulate pay-to-play activity under Section 15A of the Exchange Act.

As the SEC points out, however, the Supreme Court has instructed that when "statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976) (describing "two well-settled categories of repeals by implication: (1) where provisions in the two acts are in irreconcilable conflict ... ; and (2) if the later act covers the whole subject of the earlier one .... But, in either case, the intention of the legislature to repeal must be clear and manifest") (cleaned up). We do not take this duty lightly. *See FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) ("Because we live in an age of overlapping and concurring regulatory jurisdiction, a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may") (internal quotation omitted). In our view, that the Congress has increased the contribution limits to keep pace with inflation and that it has prohibited certain groups from making contributions is not evidence of a "clear congressional intention" to preclude the SEC from limiting campaign contributions that distort financial markets.

Finally, the petitioners make a related but distinct claim, based upon *Galliano v. U.S. Postal Service*, 836 F.2d 1362 (D.C. Cir. 1988), that the "first-amendment-sensitive" provisions of the FECA limiting individual contributions "displace" any authority the Exchange Act may have conferred upon the SEC to set further restrictions. Pet'rs' Br. 33-34 (citing *Galliano*, 836 F.2d at 1370). In *Galliano*, we held the United States Postal Service could not enforce its

statutory authority to prevent "false representations" in the mail by imposing certain disclosure requirements for political mail on top of those specifically required by the detailed disclosure provisions of the FECA, which reflect a delicate "balance of interests ... deliberately struck by Congress" in light of the first amendment considerations involved in regulating campaign finance. 836 F.2d at 1370. Similarly, as the SEC emphasizes, we were concerned that the procedures used by the Postal Service to adjudicate whether a defendant had made a "false representation" through the mail would have bypassed the "precisely drawn" dispute resolution process prescribed by the FECA. *Id.* at 1371.

At the outset, we note that in *Galliano*, which was decided prior to *Blount*, we were at pains to analyze the authority of the Postal Service in a manner that "reduce[d] constitutional doubt," *id.* at 1369, with respect to two questions: (1) whether the Postal Service's effort to "regulate solicitations for political contributions" was consistent with the First Amendment and (2) "if so, then as a matter of first amendment due process, [whether] such solicitations may be regulated without a prior judicial determination of the existence *vel non* of first amendment protections." *Id.* at 1370 n.7 (cleaned up); *see also Ken Roberts Co*., 276 F.3d at 593 (describing *Galliano* as "relying on the First Amendment and the canon of constitutional doubt in holding that the [FECA] partially preempted the postal fraud prescriptions"). Although the First Amendment is surely implicated in the present case as well, *Blount,* as described below, has since clarified that the SEC's pay-to-play rules are not constitutionally infirm under the law of this Circuit. Moreover, our concern in *Galliano* with "first amendment due process" is simply not relevant here. Whereas we were concerned in *Galliano* about whether there would be sufficient judicial review of the Postal Service's case-by-case determinations of what is a

misrepresentation and what is protected speech, *id.* at 1369, 1370 n.7, here we review only a facial challenge to whether the bright line of Rule 2030 violates the First Amendment. We are not therefore compelled by *Galliano* to resolve the allegedly overlapping authority of the SEC and the FEC by holding only one of them may regulate in a way that touches upon political contributions.

*Galliano* might nevertheless have given the petitioners some traction had the Supreme Court not later decided *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014), which supersedes some of this court's reasoning in *Galliano*. (Indeed, it is unclear to what extent *Galliano* has survived that decision.)  The Court in *POM* held that labeling regulations implementing the Food, Drug, and Cosmetic Act (FDCA) do not preclude a business from bringing a claim against a competitor for unfair competition arising from false or misleading advertising in violation of the Lanham Act.  As the SEC rightly claims, the reasoning in *POM* weighs heavily in its favor.  The Court began its analysis with the text of the two statutes, noting neither contains an express limitation on Lanham Act claims, which is "of special significance because the Lanham Act and the FDCA have coexisted" for 70 years. *Id.* at 113.  Similarly, neither of the relevant statutes in this case contains a provision limiting the reach of the other, and the first pay-to-play rule adopted by the SEC (MSRB Rule G-37) has coexisted with the FECA for 25 years.  Furthermore, in determining that the Congress did not "intend the FDCA to preclude Lanham Act suits," *id.* at 121, the Court reasoned that the two statutes "complement each other in major respects ....  Although both statutes touch on food and beverage labeling, the Lanham Act protects commercial interests against unfair competition, while the FDCA" and hence, we might add, the labeling regulation implementing it, "protects public health and safety." *Id.* at 115.  Similarly, the

FECA and the Exchange Act, as instantiated by the SEC's pay-to-play rules, can peacefully coexist: Although both regimes touch upon political contributions, the FECA is meant to protect elections from the perceived untoward effects of over-limit campaign contributions by whomever made, whilst the Exchange Act, as implemented by Rule 2030, is meant to protect the financial markets from the perceived untoward effects of over-limit contributions made by placement agents. *See Blount*, 61 F.3d at 944 ("[I]n *Buckley* and *Austin* the legislature was interested in clean elections, whereas here the SEC is interested in clean bond markets").

In so holding, we reject the petitioners' argument that the FECA is incompatible with the Exchange Act because the general $2,700 contribution limit set by the FECA serves as a "safe haven." Pet'rs' Reply Br. 18; *see Galliano*, 836 F.2d at 1370. This argument is not tenable after *POM*: The Court there considered and rejected a similar contention, reasoning that the implementing regulations of the FDCA should not be viewed as a "ceiling on the regulation of food and beverage labeling" because the "Congress intended the Lanham Act and the FDCA to complement each other." *Id.* at 119. Just as the Court observed in *POM* that "[i]t is unlikely that Congress intended the FDCA's protection of health and safety to result in less policing of misleading food and beverage labels than in competitive markets for other products," *id.* at 116, so too we think it unlikely the Congress intended the FECA's protection of the electoral process to result in less policing of corruption and inefficiency in the financial markets.

We are similarly unpersuaded by the petitioners' argument that the FECA leaves no room for the SEC to impose its own restrictions simply because the FECA is more detailed. As the Court said in *POM*, the "greater specificity

[of one law] would matter only if [the two laws] cannot be implemented in full at the same time." 573 U.S. at 118. Because, as shown above, the Exchange Act and the FECA can both be fully implemented without conflict, it matters not that the FECA is more detailed.

Finally, the petitioners' assertions to the contrary notwithstanding, the "exclusive jurisdiction" of the FEC to enforce the FECA, *see* 52 U.S.C. § 30106(b)(1), is no bar to our conclusion that the SEC may enforce the Exchange Act to reduce distortion in financial markets. Rule 2030 does not purport to give the SEC the ability to enforce provisions of the FECA. *Cf. POM*, 573 U.S. at 116-17 (explaining that although the FDA has exclusive authority to enforce the FDCA, "POM seeks to enforce the Lanham Act, not the FDCA or its regulations").

## C. Arbitrary and Capricious

In their next line of attack, the petitioners claim the order adopting Rule 2030 is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because the SEC has not shown the Rule targets corruption beyond that already prevented by federal and state laws against bribery or by the FECA.

We do not believe the federal and state laws prohibiting bribery are adequate to address pay-to-play activity, as the petitioners suggest. Laws against bribery "deal with only the most blatant and specific attempts of those with money to influence governmental action," *Wagner v. FEC*, 793 F.3d 1, 15 (D.C. Cir. 2015) (quoting *Buckley v. Valeo*, 424 U.S. 1, 27-28 (1976)); "corruption and its appearance are no doubt more widespread in the contracting process than our criminal dockets reflect." *Id.*; *see also id.* at 25.

Nor is the FECA a solution to the problem: The SEC adopted Rule 2030 precisely because it was aware of several instances in which a placement agent's contribution to a government official – lawful under the FECA – influenced that official's decision to award an advisory services contract. *See* 75 Fed. Reg. 41019/2-20/3, 41037/3. In adopting the Rule, the agency explained that placement agents played a "central role" in several pay-to-play scandals involving FECA-compliant contributions to officials in New York, Connecticut, and California. 81 Fed. Reg. at 60065/3; *see also* 75 Fed. Reg. 41019/2-20/2; *id.* at 41019/3 n.17; *id.* at 41039/3 n.290.

The petitioners minimize the significance of this evidence, arguing the SEC's examples do not show that "most, many, or even more than a few publicly disclosed $2,700 federal contributions or similar contributions made to state and local officials by placement agents will involve the kind of *quid pro quo* arrangement" the Rule aims to prevent. Pet'rs' Br. 44. That is true, but it would make no sense to require the SEC to show that quid pro quo arrangements are, as the petitioners put it, "rampant," *id.*: A contribution is corrupting even if it cannot be traced to the subsequent award of a contract for advisory services because in this market "a contribution brings the donor merely a chance to be seriously considered, not the assurance of a contract." *Blount*, 61 F.3d at 945. (Indeed, it could hardly be otherwise whenever a candidate or incumbent receives several contributions from as many would-be advisers.) Not surprisingly, in *Blount* the record contained "no evidence of specific instances of quid pro quos," yet we rejected the same argument in the form that the harms being targeted by MSRB Rule G-37 were "merely conjectural." 61 F.3d at 944. As we explained then in analyzing whether MSRB Rule G-37 violated the First

Amendment, the contributions at issue "self-evidently create[d] a conflict of interest" and, although actual corruption is difficult to detect, the "risk of corruption is obvious and substantial." *Id.* at 944-45. Accordingly, "no smoking gun is needed where ... the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic." *Id.* at 945; *see also Buckley*, 424 U.S. at 29-30 (rejecting a challenge to the contribution limit in the FECA that "most large contributors do not seek improper influence," because it is too "difficult to isolate suspect contributions").

## D. The First Amendment

We turn, finally, to the petitioners' contention that Rule 2030 violates the First Amendment. As a threshold matter, however, we must determine the standard to which the Rule should be held. The petitioners, of course, urge us to subject Rule 2030 to strict scrutiny on the ground that we are reviewing an action by the SEC as opposed to the Congress, which they say alone has the "expertise" to weigh the first amendment considerations involved. Pet'rs' Br 52. This novel theory runs up against our precedent holding the "closely drawn" standard, which is "a lesser but still rigorous standard of review" prescribed by the Supreme Court, "remains the appropriate one for review of a ban on campaign contributions," *Wagner v. FEC*, 793 F.3d at 5-6 (citing several Supreme Court cases, the most recent of which is *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (plurality opinion)). We therefore ask whether Rule 2030 is closely drawn to serve a "sufficiently important" governmental interest. *Id*. at 7-8.

As the SEC points out, we answered this question when we upheld MSRB Rule G-37 against the first amendment

challenge in *Blount*. Because MSRB Rule G-37 is identical in every constitutionally relevant way to FINRA Rule 2030, *Blount* compels our holding for the SEC in this indistinguishable case. Then, as now, the Supreme Court has said that "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances,'" *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985)); *Blount*, 61 F.3d at 944; *see also Wagner v. FEC*, 793 F.3d at 8, 22 (restrictions on the first amendment right to make political contributions may be particularly necessary in the "contracting context," which "greatly sharpens the risk of corruption and its appearance" because "there is a very specific quo for which the contribution may serve as the quid: the grant or retention of the contract"). We determined MSRB Rule G-37 survives even strict scrutiny because the rule restricts only a "narrow range of ... activities for a relatively short period of time." *Blount*, 61 F.3d at 947-48; *see also Wagner v. FEC*, 793 F.3d at 26 ("The availability of other avenues of political communication can thus be relevant, although it is of course not dispositive"). Rule 2030 contains identical safeguards and therefore survives our review today; its restrictions are closely drawn to further a compelling governmental interest, as can be seen in the specific instances of quid pro quo conduct identified by the SEC. *See* Part II.C above; 81 Fed. Reg. at 60066/1-2.

Rather than attempt to twist the logic of *Blount* in their favor, the petitioners advance two reasons for thinking our precedent is no longer good law. First, they invoke the plurality opinion in *McCutcheon* for the proposition that "*Blount* relied heavily on several strands of reasoning that the Supreme Court has since rejected." Pet'rs' Br. 50. Under the petitioners' blinkered reading of that opinion, the present case

runs afoul of the Court's admonition that a "'prophylaxis-upon-prophylaxis approach' requires that we be particularly diligent in scrutinizing the law's fit." 572 U.S. at 221.

*McCutcheon,* of course, involved an aggregate limit on political contributions that was "layered on top [of the base limits prescribed by the FECA], ostensibly to prevent circumvention of the base limits." *Id.* But the holding of *McCutcheon* is not that a belt and braces approach is necessarily unconstitutional, but that the court must be "particularly diligent in scrutinizing the law's fit" with the governmental interest it is supposed to serve. *Id.* And so we did in *Blount* by applying strict scrutiny, a standard even more exacting than the "closely drawn" standard we apply now, to evaluate the first amendment claim against MSRB G-37. 61 F.3d at 943-48.

Second, the petitioners would have us distinguish *Blount* because this court was not there asked to consider the "disparate impact that a restriction like Rule 2030 will have on candidates running for the same seat" where one candidate is a covered official and the incumbent (or another candidate) is not. Pet'rs' Br. 52. In support of their claim that this disparity necessarily makes the Rule unconstitutional, the petitioners quote dicta from two cases but disregard their reasoning: *Davis v. FEC,* 554 U.S. 724, 738 (2008), and *Riddle v. Hickenlooper*, 742 F.3d 922, 929 (10th Cir. 2014).

The operative question in both cases was not simply whether the challenged rule had a disparate effect, but whether the difference was "justified by the primary governmental interest proffered in its defense." *Davis*, 554 U.S. at 738 (cleaned up); *see Riddle*, 742 F.3d at 928. In *Davis*, the Supreme Court held the Millionaire's Amendment to the Bipartisan Campaign Reform Act, which raised the

contribution limit for a candidate if a rival candidate expended more than a certain amount of personal funds, could not withstand first amendment scrutiny. 554 U.S. at 740-41. Although the Court noted it has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," *id.* at 738, the Court invalidated the law not because of the disparate effect upon the candidates, as the petitioners suggest, but because the Government's interest in "level[ing] electoral opportunities for candidates of different personal wealth" is not a "legitimate government objective," *id.* at 741:

> Because § 319(a) imposes a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech, that provision cannot stand unless it is justified by a compelling state interest. No such justification is present here.

*Id.* at 740 (internal quotation omitted). In contrast, the Court has repeatedly – and, indeed, in the same case – recognized that the prevention of "corruption and the appearance of corruption" can justify an abridgment of first amendment rights as long as the limits are "closely drawn" to serve that important interest. *See id*. at 737; *McCutcheon*, 572 U.S. at 191-92; *FEC v. Nat'l Conservative Political Action Comm*., 470 U.S. at 496-97.

*Riddle*, in which the Tenth Circuit invalidated a Colorado statute as a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, 742 F.3d at 930, is likewise no help to the petitioners. The state law at issue set a lower limit on contributions to write-in candidates ($200) than to major-party candidates ($400). *Id.* at 924, 926. The court determined those limits were "ill-conceived" to advance the State's claimed interest in

preventing corruption or its appearance: "The statutory classification might advance the State's asserted interest if write-ins, unaffiliated candidates, or minor-party nominees were more corruptible (or appeared more corruptible) than their Republican or Democratic opponents. But the Defendants have never made such a suggestion." *Id.* at 928. In stark contrast, the SEC, in keeping with our observation in *Wagner v. FEC*, 793 F.3d at 22-23, persuasively counters that an elected official who can influence the award of contracts is indeed more susceptible to corruption than an opponent who cannot exert the same influence. Accordingly, we agree with the SEC that any disparate effect from Rule 2030 is a feature, not a flaw, of the narrow tailoring of the Rule; hence the Rule is indeed closely drawn to fit the important governmental interest behind it.

## III. Conclusion

For the reasons set out in Part II above, we hold the NGYOP has standing to sue. On the merits, we conclude the SEC (1) had the authority to adopt Rule 2030, (2) has justified doing so based upon both specific instances of quid pro quo corruption and upon the inherent tendency toward an appearance of corruption arising from the targeted contributions of placement agents; and (3) has shown the Rule does not violate the First Amendment because it was closely drawn to advance a sufficiently important governmental interest. For those reasons the petition for review is

*Denied*.

SENTELLE, *Senior Circuit Judge,* dissenting: I do not join my colleagues in the judgment denying this petition, not because I would grant the petition, but because I would dispense with it by dismissal for want of jurisdiction. As the Supreme Court reminds us, in order to bring an action in federal court a petitioner carries the burden of establishing that it has standing to bring the action. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). To establish standing, the petitioners would have to show (1) that they have suffered an injury-in-fact; (2) that injury was caused by the challenged conduct of the defendant or respondent; and (3) that a favorable decision in the litigation would likely provide redress for the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Petitioners have failed to meet the first and most basic step of this three-part constitutional minimum, as well as the second. First, they have established no injury-in-fact.

The majority opinion sets forth the facts underlying this litigation. I have no quarrel with their understanding of the facts, but reach a different legal conclusion based on the facts before the court. I therefore will make reference to the facts only as necessary to support my legal reasoning. As the majority acknowledges, neither petitioner's conduct is regulated by the respondent's action, Rule 2030, and therefore they do not claim the near-automatic standing of a regulated entity. Petitioners assert instead that NYGOP has established standing on the theory that an organization is "harmed if its contributors cease giving it money." *See Taxation with Representation of Washington v. Regan*, 676 F.2d 715, 723 (D.C. Cir. 1982), *rev'd on other grounds*, 461 U.S. 540 (1983). While this may be a valid theory, it simply does not apply to this case. Neither of petitioners has shown that any contributor has stopped contributing because of the action of the Securities and Exchange Commission.

For a harm to meet the standard for the first requirement of standing, it must be an actual or at least "certainly impending" injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). The Supreme Court has, as the majority notes, given a slightly relaxed construction to the effect of the "certainly impending" standard by recognizing that a petitioner may cross the bar of the first standing requirement by establishing a "substantial risk" that the anticipated harm will occur. *See Susan B. Anthony*, 573 U.S. at 158. Nonetheless, the very language of the Supreme Court in *Susan B. Anthony* establishes that for the risk of an anticipated harm to substitute for actual injury at the first step of the standing analysis, that risk must not only exist but be substantial. Petitioners have not carried the burden of establishing a substantial risk.

In an attempt to meet its weighty burden, NYGOP has submitted the affidavit of Francis Calcagno, a placement agent covered by Rule 2030. Calcagno cannot attest to any injury-in-fact that has occurred to the petitioners, but only swears that if it were not for the SEC's rule he would solicit contributions for the NYGOP from his friends, family, and other contacts. As the majority recognizes, he cannot attest with certainty that any of his contacts would contribute to petitioners in the absence of the rule.

Petitioners argue that the affidavit brings them within the precedent of *Taxation with Representation*. However, that case only held that standing is established for an organization "if its contributors cease giving it money." Calcagno's affidavit establishes no such facts. At most, it establishes that he believes that if it were not for the rule he would speak to unnamed contacts, friends, and relatives on behalf of the petitioners, and that some of those unnamed contacts, friends, or relatives could contribute. This is not the establishment of a substantial risk. This is at most speculation.

3

Many cases hold that speculation is not the same as establishing injury-in-fact for purposes of standing. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (citing *Lujan*, 504 U.S. at 565 n.2). Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact, and [] allegations of *possible* future injury are not sufficient." *Id*. at 398 (internal quotations omitted).

Petitioners' argument for standing does not survive examination as required by *Clapper*. Their "theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.' " *Id.* at 401 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Even if the majority is correct in its holding that this is a sufficient showing of injury, petitioners' claims founder on the second step of the standing analysis. That is, even if petitioners have established that they suffer injury-in-fact, they have not established that the injury-in-fact is caused by the act of respondent. Both this court and the Supreme Court have held that when the establishment of injury depends on the volitional act of a third party, the claimant has not established standing as against the respondent.

Again, I would follow the teachings of the Supreme Court. In *Clapper* the Court stated, "[w]e decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." 568 U.S. at 414.

To summarize, as the Supreme Court did in *Clapper*, petitioners "bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.' " *Id.* at 414 n.5 (quoting *Lujan*, 504 U.S. at 562).

Therefore, rather than deny the petition, I would dismiss it for want of jurisdiction.