# United States Court of Appeals
## For the First Circuit

No. 22-1907

MALCOLM WIENER,

Plaintiff, Appellant,

v.

MIB GROUP, INC. and JONATHAN SAGER,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Rikelman, Lipez, and Thompson,
Circuit Judges.

David G. Webbert, with whom Johnson & Webbert, LLP, Megan C. Deluhery, Todd & Weld LLP, and Carolyn T. Seely were on brief, for appellant.

Todd P. Stelter, with whom Marissa I. Delinks and Hinshaw & Culbertson LLP were on brief, for appellees.

November 9, 2023

**RIKELMAN**, **Circuit Judge**.  Several years ago, Malcolm Wiener sued his former life insurance company for negligence.  He claims that the defendants here tried to torpedo that lawsuit, to which they were not parties, by illegally disclosing to his former insurer confidential information protected by a federal statute.  This case presents one question: Does Wiener have Article III standing to sue the defendants in this case based on the additional attorney's fees and costs he incurred to respond to their actions in that separate lawsuit?  Because a past, out-of-pocket loss is a quintessential basis for Article III standing, we conclude the answer is yes.  Therefore, we reverse the district court's order dismissing this case at the pleading stage for lack of standing.

## I.  BACKGROUND

### A.  Relevant Facts[1]

MIB Group, Inc. is an information clearinghouse and is owned by its member life and health insurance companies.  For a number of years, Jonathan Sager was its Executive Vice President and General Counsel.[2]

---

[1] We draw the relevant facts from Wiener's amended complaint. See Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 369 (1st Cir. 2023).

[2] For the purposes of this opinion, and as we will discuss later, we assume that MIB Group, Inc. is a "consumer reporting agency" subject to the Fair Credit Reporting Act.  We also assume that Sager was one of MIB's agents such that it could be held liable for his actions challenged in the amended complaint.

MIB's services enable its members to evaluate "an individual's risk and eligibility during the underwriting of life, health, disability income, critical illness, and long-term care insurances policies." For example, MIB collects information about a life-insurance applicant's medical conditions from its members and "makes this information available to member[s] . . . who receive an authorized release" from the applicant. It also collects information about "which member companies have reviewed or queried an MIB file on a particular individual." For privacy reasons, the medical information in an individual's MIB file "is catalogued using proprietary 'codes'" selected by the reporting member company. Other member companies with an executed authorization may view the MIB codes assigned to a particular individual, which member company supplied the codes, and whether (and, if so, which) member companies have "formally queried the file" or "made less formal reviews."

As of June 2020, MIB had 390 members that "represent[ed] 90-95% of all individual life insurance application activity in the United States." One of its members was AXA Equitable Life Insurance Company ("AXA").

In the late 1980s, Wiener purchased three universal life insurance policies from AXA for a total value of $16 million. In 2013, following a "payment error or oversight," AXA terminated these policies and sent Wiener an application for reinstatement.

At AXA's request, Wiener submitted certain medical information to provide "a preliminary indication" of his insurability. But AXA denied Wiener's application after evaluating information from one of his physicians, an evaluation he later learned had been performed by AXA "falsely and negligently." AXA then reported to MIB certain codes that identified four serious medical conditions, which Wiener did not actually have, as the basis for its decision not to reinstate his policies. The false report rendered Wiener effectively uninsurable "at the appropriate rate for his true health status."

In January 2018, Wiener sued AXA in North Carolina state court, and AXA promptly removed the case to federal court on the basis of diversity jurisdiction. See generally Wiener v. AXA Equitable Life Ins. Co., No. 3:18-cv-00106 (W.D.N.C.) (the "North Carolina Litigation").[3] In the North Carolina Litigation, Wiener alleged that AXA negligently "reported false conclusions about his medical conditions to . . . MIB, causing him to become uninsurable." Wiener v. AXA Equitable Life Ins. Co., 58 F.4th

_____

[3] The parties agree that we may take judicial notice of the public filings in the North Carolina Litigation as part of our analysis of Wiener's amended complaint in this case. They are correct. See Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 19 (1st Cir. 2004) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990))).

- 4 -

774, 778 (4th Cir. 2023).[4]  His complaint included a request for attorney's fees and costs.

During the North Carolina Litigation, Sager provided AXA with information about "an 'extended activity file' that MIB had maintained on . . . Wiener going back to 1995."  Specifically, he disclosed that "no member companies except AXA . . . and [its reinsurer] ever made an inquiry of . . . Wiener's MIB file since 1995" (the "Disclosure").  According to Sager, this meant that "no information contained in . . . Wiener's file [had] ever been shared with any other member company except AXA . . . and [its reinsurer]."  He provided this information to AXA "voluntarily," "not pursuant to any [c]ourt or other compelled process," and without Wiener's authorization.  At the time Sager searched the extended activity file, he knew that AXA had a policyholder relationship with Wiener at some point but did not know (or make any effort to determine) whether Wiener was still insured by AXA.

Sager then worked with AXA to draft a declaration from him conveying this information, which AXA submitted in support of

[4] Wiener's complaint in the North Carolina Litigation also alleged negligent misrepresentation, libel, and a violation of North Carolina's Unfair and Deceptive Trade Practices Act, but the district court dismissed these claims on summary judgment.  See Wiener, 58 F.4th at 778.

- 5 -

a motion in limine to exclude Wiener's causation expert at trial.[5] That expert was prepared to testify that: (1) MIB's member insurance companies review the information coded into an individual's MIB file to determine that individual's insurability; and (2) "AXA's inaccurate code reporting to MIB created an insurmountable obstacle to [Wiener's] insurability with other carriers" and rendered him "effectively uninsurable." Sager also eventually testified at the North Carolina trial, reiterating the information in his declaration and confirming that he had conducted the search of the extended activity file "on [his] own initiative . . . knowing that there was some controversy."

Wiener "incurred attorney's fees and costs associated with having to respond to" the Disclosure, which came after the close of discovery in the North Carolina Litigation. "This placed [Wiener] at a substantial disadvantage in the litigation and caused not only financial harm but distress as well."

---

[5] In this case, Wiener alleges in his amended complaint that AXA filed Sager's declaration "in support of a dispositive motion." He concedes in his opening brief on appeal, however, that this allegation was incorrect and that AXA filed the declaration "in support of three motions in limine as referenced in the briefing below and apparent from review of the docket in" the North Carolina Litigation. Before the district court, though, Wiener cited (and filed a copy of) only one motion in limine, namely, AXA's motion to exclude Wiener's expert from testifying at trial. Because Wiener did not rely on the other two motions in limine for his standing argument below, we do not consider those motions here.

Nevertheless, at the conclusion of the North Carolina trial in September 2020, the jury returned a verdict in Wiener's favor. AXA subsequently filed a motion to dismiss for lack of subject matter jurisdiction and to set aside the verdict. In addition to challenging the district court's subject matter jurisdiction,[6] AXA argued that there was insufficient evidence of harm to support the jury's verdict for Wiener on his negligence claim. The district court granted AXA's motion on jurisdictional grounds, declining to address AXA's remaining arguments.

Wiener appealed to the U.S. Court of Appeals for the Fourth Circuit. In 2023, the Fourth Circuit reversed the decision granting AXA's motion to dismiss. See Wiener, 58 F.4th at 777, 785. In doing so, it also concluded that "[a]mple evidence supported the jury's verdict for Wiener." Id. at 784. It remanded the case for review of post-trial damages issues. See id. at 777, 785.

## B.    Proceedings Below

Wiener brought this suit against MIB and Sager (collectively, "MIB") in the District of Massachusetts in May 2022, while his appeal in the North Carolina Litigation was pending. In July, he filed the operative amended complaint in this case,

---

[6] The basis of AXA's jurisdictional challenge was that an exclusive-remedies provision in a North Carolina statute preempted Wiener's negligence claim. Wiener, 58 F.4th at 779.

bringing two counts under the Fair Credit Reporting Act (the "FCRA")[7] and seeking damages, declaratory and injunctive relief, attorney's fees, and costs. Shortly thereafter, MIB filed a motion to dismiss the amended complaint. MIB pursued two grounds for dismissal: failure to plead Article III standing and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) for any violation of the FCRA.[8] Wiener opposed on both grounds. On Article III standing, he pointed to two harms alleged in his amended complaint: the out-of-pocket loss he incurred, in the form of additional attorney's fees and costs, to respond to the Disclosure in the North Carolina Litigation; and the distress caused by MIB's invasion of his privacy via the Disclosure.

---

[7] More specifically, Wiener alleged violations under sections 1681n and 1681r (Count I) and 1681o (Count II) of the FCRA. Section 1681r prohibits "[a]ny officer or employee of a consumer reporting agency [from] knowingly and willfully provid[ing] information concerning an individual from the agency's files to a person not authorized to receive that information." 15 U.S.C. § 1681r. Sections 1681n and 1681o "provide[] a private right of action and impose[] civil liability on users of credit information and consumer reporting agencies for noncompliance with the requirements of the [FCRA]" if the noncompliance was willful (§ 1681n(a)), knowing (§ 1681n(b)), or negligent (§ 1681o). Sullivan v. Greenwood Credit Union, 520 F.3d 70, 74 (1st Cir. 2008).

[8] Although MIB characterized its standing challenge as arising under Rule 12(b)(6), we consider its motion to dismiss for lack of standing as made under Rule 12(b)(1), which permits motions to dismiss for lack of subject matter jurisdiction. See Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 46 (1st Cir. 2020) (noting that "standing is a prerequisite to a federal court's subject matter jurisdiction" (quoting Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016))).

In October 2022, the parties presented oral argument on the motion to dismiss. At the start of the hearing, the district court noted that Wiener's "most difficult problem" was constitutional standing and asked how Wiener had been harmed. Wiener's counsel cited "two aspects of . . . harm for standing purposes." The first harm, she explained, was an "invasion of a privacy interest, . . . which has been protected in the common law for over 100 years." But before she could make her second point, the district court posed a question and then quickly pivoted to MIB's counsel. After a brief exchange with MIB's counsel, the district court ruled from the bench that Wiener lacked Article III standing and granted the motion to dismiss. In total, the hearing lasted about five minutes. The district court thereafter entered a one-sentence written order of dismissal. It never reached MIB's arguments that the amended complaint failed to state a claim under Rule 12(b)(6). Wiener timely appealed.

## II.  STANDARD OF REVIEW

We review de novo the district court's decision to dismiss the case on Article III standing grounds based on the face of the amended complaint, prior to any discovery. See Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 371 (1st Cir. 2023). In doing so, we "take the [amended] complaint's well-pleaded facts as true and indulge all reasonable inferences in [Wiener]'s favor." Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016);

- 9 -

see Webb, 72 F.4th at 371. We also "consider (a) implications from documents attached to or fairly incorporated into the [amended] complaint, (b) facts susceptible to judicial notice, and (c) [any] concessions in [Wiener]'s response to the motion to dismiss." Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (cleaned up) (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55-56 (1st Cir. 2012)).

It is Wiener's burden, as the plaintiff, to allege sufficient facts "to plausibly demonstrate" standing. DiCroce v. McNeil Nutritionals, LLC, 82 F.4th 35, 39 (1st Cir. 2023) (quoting Hochendoner, 823 F.3d at 731). "Neither conclusory assertions nor unfounded speculation can supply the necessary heft." Hochendoner, 823 F.3d at 731. Because "standing is not dispensed in gross," Wiener must demonstrate standing for each claim he brings and each form of relief he seeks. TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2208 (2021).

We must "accept as valid" the merits of Wiener's legal claims in evaluating Article III standing. Fed. Election Comm'n v. Cruz, 596 U.S. 289, 298 (2022); see Hochendoner, 823 F.3d at 734 (evaluating standing without considering "the plaintiffs' [substantive] claims as a matter of law or the adequacy of their pleading to state a claim"); see also Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1660 (2019) (noting that the uncertainty or unlikelihood of a plaintiff's ultimate recovery "is

- 10 -

of no moment" to the issue of standing). Accordingly, for the purposes of this opinion, we assume that Wiener has adequately pleaded claims under the FCRA against MIB. See Cruz, 596 U.S. at 298.

### III. DISCUSSION

Wiener argues that the district court erred in dismissing his amended complaint for lack of Article III standing. He also urges us to hold that he has plausibly stated a claim for violations of the FCRA, even though the court never reached MIB'S Rule 12(b)(6) arguments. We agree that the district court erred in dismissing the amended complaint on Article III grounds but remand so that it can consider MIB's Rule 12(b)(6) arguments in the first instance.

### A. Article III Standing

Article III of the Constitution limits "the judicial Power" to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; see Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). In evaluating Article III standing, we essentially "determine whether [a] particular plaintiff is entitled to have a federal court" decide their dispute. Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006).

To demonstrate Article III standing, a plaintiff must meet a familiar three-part test. "[A] plaintiff must show (i)

- 11 -

that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion, 141 S. Ct. at 2203. An injury is concrete if it "actually exist[s]" and particularized if it "affect[s] the plaintiff in a personal and individual way." Spokeo, 578 U.S. at 339-40 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 n.1 (1992)); see DiCroce, 82 F.4th at 39. The causation prong requires that the plaintiff's injury be fairly traceable to the defendant's conduct, rather than the result of "independent action" by some other party not before the court. Lyman, 954 F.3d at 361 (quoting Lujan, 504 U.S. at 560). Finally, the redressability prong requires that the plaintiff request relief that is likely to remedy their injury. See Uzuegbunam v. Preczewski, 141 S. Ct. 792, 797 (2021); Brito v. Garland, 22 F.4th 240, 253 (1st Cir. 2021). If the plaintiff fails at the pleading stage to allege facts demonstrating each element of standing, "there is no case or controversy for the federal court to resolve." TransUnion, 141 S. Ct. at 2203 (quoting Casillas v. Madison Ave. Assocs., Inc., 926 F.3d 329, 333 (7th Cir. 2019)); see Spokeo, 578 U.S. at 338.

Importantly, Wiener does not "automatically satisf[y]" Article III's requirements simply because the FCRA grants him "a statutory right and purports to authorize [him] to sue to vindicate

- 12 -

that right." Spokeo, 578 U.S. at 341. "[E]ven in the context of a statutory violation," Wiener must allege an injury in fact to satisfy Article III standing. TransUnion, 141 S. Ct. at 2204 (quoting Spokeo, 578 U.S. at 341); see Plazzi v. FedEx Ground Package Sys., Inc., 52 F.4th 1, 4 (1st Cir. 2022).

To that end, Wiener asserts that he has plausibly pleaded two types of harm: (1) out-of-pocket loss in the form of attorney's fees and costs that he already incurred in the North Carolina Litigation as a result of the Disclosure; and (2) emotional distress arising from MIB's invasion of his privacy interests (vis-à-vis the Disclosure).[9] Because we conclude that Wiener's out-of-pocket loss is sufficient to give him Article III standing to bring his damages claims under the FCRA, we do not reach his second standing argument. See Webb, 72 F.4th at 377-78 (declining to address standing based on alleged emotional distress after concluding plaintiffs plausibly alleged standing via another

---

[9] We pause to note that Wiener's opening brief focuses almost exclusively on the injury inquiry, but his reply delves into the remaining standing elements. MIB does not take issue with this approach, perhaps because of the district court's focus on the injury prong. But we do not need to dwell on the upshot of any of this because, deploying de novo review, we find on this record that we are amply equipped to tackle a comprehensive standing analysis. See Hoolahan v. IBC Advanced Alloys Corp., 947 F.3d 101, 115 n.20 (1st Cir. 2020) ("[W]e exercise our discretion to bypass the issue of . . . waiver and leave the ramifications for another day, particularly because we will analyze [the appellant]'s arguments under a de novo standard . . . ." (citation omitted)).

basis); <u>Attias</u> v. <u>Carefirst, Inc.</u>, 865 F.3d 620, 626 n.2 (D.C. Cir. 2017) ("Because we conclude that all plaintiffs . . . have standing to sue . . . based on their heightened risk of future identity theft, . . . we will not address the other theories of standing advanced by plaintiffs . . . .").

### 1.    Injury in Fact

Wiener's alleged injury in fact is straightforward: He claims that after discovery closed in the North Carolina Litigation, Sager illegally disclosed to AXA information that was potentially fatal to Wiener's claims in that case.  Wiener was caught off-guard, had to respond "without the typical discovery methods," and incurred additional attorney's fees and costs in doing so.  In evaluating the allegations in the amended complaint, we "draw on our judicial experience and common sense . . . and read the complaint as a whole."  <u>Webb</u>, 72 F.4th at 374 (brackets omitted) (quoting <u>In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.</u>, 54 F.4th 28, 39 (1st Cir. 2022), <u>cert. denied</u>, No. 22-1181, 2023 WL 6377930 (U.S. Oct. 2, 2023)).

The docket in the North Carolina Litigation supports Wiener's allegations.  Wiener's negligence claim against AXA was based on the premise that AXA's erroneous code reporting to MIB caused him to become virtually uninsurable, as any insurer would have declined coverage after discovering the four serious medical conditions listed in his MIB profile.  To that end, Wiener's expert

- 14 -

was prepared to testify that "AXA's inaccurate code reporting to MIB created an insurmountable obstacle to [Wiener's] insurability with other carriers." AXA used Sager's declaration to support its (ultimately unsuccessful) motion in limine to exclude Wiener's expert. It relied on Sager's declaration to argue that, contrary to the opinion of Wiener's expert, "MIB [had] confirmed that none [of its member companies] requested . . . Wiener's MIB codes" or relied on those codes. And at trial, Sager testified that a search of Wiener's MIB file revealed no insurer had ever accessed the codes in his file. The thrust of Sager's declaration and testimony was that, if no insurer had ever seen the codes AXA inaccurately reported to MIB, AXA's reporting could not have caused Wiener's uninsurability.

We find the amended complaint's "allegations sufficient to meet the minimal plausibility standard for" pleading an Article III injury. DiCroce, 82 F.4th at 39. The plausibility standard "does not demand 'a high degree of factual specificity'" in the context of a motion to dismiss. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (quoting Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012)).[10] Viewed as a whole, the amended complaint demonstrates "that [Wiener] has personally

---

[10] Accordingly, contrary to MIB's suggestion, Wiener was not required to allege explicitly in the amended complaint "how, when, where, why and to whom [he] owes or will eventually owe attorney's fees."

suffered economic harm in the past as a result of [MIB's] alleged misconduct," and that is enough at this stage. DiCroce, 82 F.4th at 39.

Although his substantive claims are based on a statute, Wiener does not "allege a bare procedural violation [of the FCRA], divorced from any concrete harm," Spokeo, 578 U.S. at 341, or "merely seek[] to ensure [MIB]'s 'compliance with [statutory] law,'" TransUnion, 141 S. Ct. at 2206 (citation omitted). Rather, he alleges an out-of-pocket loss, a quintessential injury in fact. See Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7-8 (1st Cir. 2018); TransUnion, 141 S. Ct. at 2204; Webb, 72 F.4th at 372.

MIB disagrees, devoting most of its argument on appeal to undermining Wiener's alleged injury. It cites the general premise that a plaintiff cannot establish Article III standing "by bringing suit for the cost of bringing suit" and relies on a number of cases to support this argument. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998) ("[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself."); Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990) ("[An] interest in attorney's fees is, of course, insufficient to create an Article

III case or controversy where none exists on the merits of the underlying claim.").

None of the cases MIB cites is on point. Wiener is not "bringing suit for the cost of bringing suit," as he does not seek "reimbursement of [fees or] costs that are a byproduct of [this] litigation" against MIB. Steel Co., 523 U.S. at 107. Rather, he seeks damages to recover legal expenses that he already incurred in a separate lawsuit against a different party. As the Sixth Circuit has recognized, "[f]ees from a separate proceeding . . . do not raise typical standing concerns because the harm has already materialized, and the plaintiff cannot manufacture standing simply by filing a new lawsuit." Hurst v. Caliber Home Loans, Inc., 44 F.4th 418, 423 (6th Cir. 2022) (emphasis added) (concluding that attorney's fees allegedly incurred by mortgagor in separate, foreclosure action due to mortgagee's violation of real estate statute satisfied injury-in-fact requirement to confer standing); see, e.g., Bouye v. Bruce, 61 F.4th 485, 490 (6th Cir. 2023) (concluding that plaintiff had standing because she had not "plead[ed] a mere statutory violation" but also an injury, as "she had to defend against a state lawsuit that [the defendant] had no right to bring in the first place").[11]

_____

[11] In its Rule 28(j) letter, MIB also directs our attention to the Seventh Circuit's recent decision in Choice v. Kohn L. Firm, S.C., 77 F.4th 636 (7th Cir. 2023). In Choice, the plaintiff

MIB nevertheless contends that "it makes little sense that the . . . Disclosure, a seemingly benign (and truthful and accurate) communication, somehow materially caused Wiener financial harm above and beyond that already incurred in the normal course of the North Carolina [L]itigation." But drawing all reasonable inferences from the amended complaint's factual allegations in Wiener's favor, we conclude otherwise.

As Wiener claims, the North Carolina Litigation's public filings suggest that the Disclosure was engineered to end that case by undermining any causal connection between AXA's actions and Wiener's later inability to secure life insurance. Using our common sense and judicial experience, we find it entirely plausible that Wiener would have expended additional fees and costs to address this potentially litigation-ending evidence. The truth or

alleged that the defendants' contradictory statements in a separate, debt collection lawsuit caused him to take the "detrimental step" of litigating the dispute rather than settling the debt. See 77 F.4th at 637-39. The Seventh Circuit concluded that Article III standing was lacking because the plaintiff's complaint contradicted his claim that the defendants had induced him to litigate; rather, the complaint indicated the defendants' actions simply left him "confused about the proper course of action" to take and so he consulted an attorney. Id. at 639 (citing Seventh Circuit precedent that "confusion leading one to hire a lawyer [and pay an appearance fee] is insufficient to establish standing"). Here, by contrast, Wiener's theory of standing does not rest on mere confusion about next steps. Instead, he alleges that MIB forced his hand and required him to respond defensively to its actions, expending extra attorney's fees and costs in the process. We therefore find Choice inapposite.

accuracy of the Disclosure, although potentially relevant to Wiener's substantive claims under the FCRA, is not relevant to his standing argument based on an out-of-pocket loss. See Hochendoner, 823 F.3d at 734 (conducting standing inquiry without regard to "the validity of any of the plaintiffs' [substantive] claims as a matter of law or the adequacy of their pleading to state a claim under Rule 12(b)(6)").

MIB also argues that Wiener's alleged injury is conjectural and hypothetical and therefore "squarely precluded" by Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013). MIB misunderstands Clapper and Article III jurisprudence generally. In Clapper, the plaintiffs voluntarily engaged in costly and burdensome measures that they claimed were necessary to protect their communications from a government surveillance program. See 568 U.S. at 402, 415. The Supreme Court rejected this basis for standing because the plaintiffs could not show that they had been, or were likely to be, subjected to surveillance. See id. at 416. The Court held that the plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Id.; see id. at 409 (explaining that "threatened injury must be certainly impending to constitute an injury in fact" (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990))).

Given that the Disclosure already occurred and Wiener already spent money to respond to it, his harm is not hypothetical or conjectural and MIB's arguments based on Clapper make little sense. Importantly, our "inquiry into standing must be based on the facts as they existed when the action was commenced." Roe v. Healey, 78 F.4th 11, 20 (1st Cir. 2023) (quoting Ramírez v. Sánchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006)). At the time he filed the amended complaint, Wiener had incurred attorney's fees and costs because of the Disclosure and had not been reimbursed for those fees or costs.

We address two final points by MIB to wrap up our injury-in-fact inquiry. First, MIB suggests that, at the hearing on the motion to dismiss, Wiener intentionally limited his standing argument to the invasion of privacy harm. The hearing transcript undermines this assertion. The hearing lasted no more than five minutes before the district court delivered its oral decision, without any opportunity for Wiener's counsel to address the second point she had teed up at the start of her argument. There was no intentional waiver here. Second, MIB perfunctorily asserts that Wiener's alleged injury is not particularized. Even if MIB has not waived this argument, it is meritless. Wiener's loss of his own money affected him "in a personal and individual way." Spokeo, 578 U.S. at 339 (citation omitted); see Gustavsen, 903 F.3d at 7 (finding an "out-of-pocket loss of money" to be a particularized

injury).  In sum, Wiener has sufficiently alleged an injury in fact.

## 2.  Causation

Wiener's alleged financial harm is also fairly traceable to MIB's conduct.  Taking the amended complaint's well-pleaded facts as true and indulging all reasonable inferences in Wiener's favor, it is plausible that Wiener could have avoided additional attorney's fees and costs had the Disclosure not occurred. Although AXA ultimately leveraged the Disclosure in the North Carolina Litigation, it was Sager who voluntarily shared Wiener's FCRA-protected information with AXA, "knowing that there was some controversy" between AXA and Wiener.  Accordingly, the Disclosure was not "the result of the independent action of" AXA.  Lyman, 954 F.3d at 361 (brackets omitted) (quoting Lujan, 504 U.S. at 560); see Dep't of Com. v. New York, 139 S. Ct. 2551, 2566 (2019) (finding causation where respondents' theory of standing relied "on the predictable effect of [the petitioner]'s action on the decisions of third parties").

MIB nonetheless argues that any harm that Wiener experienced was "self-inflicted," again citing Clapper.  MIB continues to misread that case.  In Clapper, the Supreme Court concluded that, because the plaintiffs did "not face a threat of certainly impending interception under [the Foreign Intelligence Surveillance Act], the costs that they [had] incurred to avoid

surveillance [were] simply the product of their fear of surveillance." 568 U.S. at 417. The costs were therefore "self-inflicted" rather than traceable to the government's activities. See id. at 418.

The type of self-inflicted harm at issue in Clapper is not implicated here. Unlike the plaintiffs in Clapper, Wiener did not incur costs to prevent a speculative future harm. Instead, he responded, after the fact, to critical evidence introduced by his adversary in a lawsuit. In doing so, he incurred additional litigation-related expenses. Responding to important evidence is part and parcel of all litigation. Accordingly, we find entirely unpersuasive MIB's argument that Wiener's decision to respond to evidence that could have been fatal to his claims constituted "self-inflicted" harm.

### 3. Redressability

Finally, a damages award against MIB would redress Wiener's alleged financial harm. See Gustavsen, 903 F.3d at 9 ("Nor can there be any doubt that plaintiffs' financial injury can be redressed by damages."); see also Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 49 (1st Cir. 2020) (explaining that a plaintiff "must show that the court can fashion a remedy that will at least lessen [their] injury" but "need not demonstrate that [their] entire injury will be redressed by a favorable judgment").

Recycling its earlier arguments, MIB claims that the possibility that Wiener may recover attorney's fees and costs in the North Carolina Litigation means that he has failed to meet the redressability prong. In MIB's view, Wiener's "claims of harm here would be rendered moot" if he were awarded fees and costs in the North Carolina Litigation. "The burden of establishing mootness rests squarely on the party raising it, and '[t]he burden is a heavy one.'" Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003) (alteration in original) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)). At this stage, MIB has failed to meet that burden.

Indeed, MIB's hypothesis that Wiener may recover attorney's fees and costs in the North Carolina Litigation, and that any such award may include full reimbursement for his costs and expenses in responding to the Disclosure, is pure speculation. It in no way alters the basic facts alleged here: Wiener has incurred an out-of-pocket loss, that loss remains unreimbursed, and the district court could remedy that loss with a damages award.[12]

---

[12] Moreover, as Wiener notes, the district court in the North Carolina Litigation dismissed his claim seeking attorney's fees prior to trial. See Wiener, No. 3:18-cv-00106, ECF No. 1-2, at 11-12 (W.D.N.C. Mar. 8, 2018) (complaint requesting attorney's fees in connection with claim for unfair and deceptive trade practices); Wiener v. AXA Equitable Life Ins. Co., No. 3:18-cv-00106, 2020 WL 3035222, at *9 (W.D.N.C. June 5, 2020) (order

### B. Rule 12(b)(6) Arguments

Because the district court did not address MIB's Rule 12(b)(6) arguments, we leave it to the district court to consider those arguments on remand. See Webb, 72 F.4th at 378 (remanding case for district court to consider alternative bases for dismissal); In re Evenflo, 54 F.4th at 41 (same). We express no view on those arguments.

### IV. CONCLUSION

For all these reasons, we reverse the district court's order dismissing Wiener's amended complaint on Article III standing grounds and remand for further proceedings consistent with this opinion.

---

dismissing, inter alia, claim for unfair and deceptive trade practices).